**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

-------------------------------------------------------X
JENNIFER MORRIS,                           :
                                           :      Civil Case No.:
                Plaintiff,     :
                                           :      **COMPLAINT**
    v.                                     :
                                           :      **Jury Trial Demanded**
NEXTERA ENERGY, INC. and FLORIDA           :
POWER & LIGHT COMPANY,                     :
                                           :
                Defendants.    :
-------------------------------------------------------X

      Plaintiff Jennifer Morris, as and for her complaint against Defendants NextEra Energy, Inc. ("NextEra") and Florida Power & Light Company (together, "FPL" or "Defendants"), hereby alleges as follows:

**PRELIMINARY STATEMENT**

      1.     As the public becomes increasingly exposed to harrowing accounts of people tragically taking their own lives despite otherwise appearing to be happy, successful and productive members of society, a common theme emerges: those with mental health disabilities are often left to suffer in silence.

      2.     Fortunately, there are laws are in place to protect employees with mental health disabilities from workplace discrimination, and which prohibit employers from penalizing employees who seek assistance at work to improve their mental wellbeing.

      3.     Sadly, however, NextEra Energy, Inc. and its principal subsidiary Florida Power & Light Company, Florida's largest and most ubiquitous energy supplier, and an employer of thousands of people, blatantly punishes workers who seek help addressing their own mental health disabilities. Indeed, at the same time NextEra's website touts its "Health & Well-Being" program as providing "information, motivation and on-site facilities to help employees take care

of themselves and their families,"[1] and claims that it "believe[s] in fostering a culture that …
[r]ecognizes that health and well-being are critical for success in life, as well as in business,"[2]
FPL employees who seek disability-related work accommodations and assistance are ostracized,
ignored and shunned.

4. Plaintiff Jennifer Morris was one such victim.

5. Ms. Morris, a decorated accountant who received two promotions during her three-year tenure, was egregiously fired by FPL less than a month after she requested a reasonable accommodation to help her address her mental health disability.

6. As the facts make clear, Ms. Morris's mere attempt to assert her legal rights and protect her mental wellbeing was evidently too much for FPL to address, as they failed to even evaluate or respond to her request.

7. Simply put, rather than grant Ms. Morris's mental health accommodation request, or at the very least engage in the interactive process and come to a mutually workable solution as is required by law, Defendants chose instead to unlawfully retaliate against Ms. Morris for making her accommodation request by abruptly terminating her employment because of her disability.

8. Accordingly, Ms. Morris now brings this action for declaratory, injunctive and equitable relief, as well as monetary damages, against Defendants in order to redress the unlawful employment practices committed against her in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq*. ("ADA") and the Florida Civil Rights Act of 1992, Fla. Stat. Ann. § 760.01, *et seq*. ("FCRA").

---

[1] http://www.nexteraenergy.com/sustainability/employees/health.html (last accessed January 28, 2020).
[2] http://www.nexteraenergy.com/sustainability/employees.html (last accessed January 28, 2020).

## ADMINISTRATIVE PREREQUISITES

9. On April 4, 2019, Plaintiff filed a charge of discrimination and retaliation against Defendants with the Equal Employment Opportunity Commission ("EEOC") alleging violations of the ADA. The EEOC subsequently issued Plaintiff a Notice of Right to Sue ("Right to Sue") on December 5, 2019.

10. Plaintiff now files this complaint within 90 days of the issuance of the Right to Sue.

11. Plaintiff has complied with any and all other prerequisites prior to filing this action.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves a federal question regarding the deprivation of Plaintiff's civil rights. This Court has supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).

13. Venue is proper in this County pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

14. Plaintiff Jennifer Morris is a former employee of Defendants. At all relevant times, Ms. Morris fell within the definition of a "person" and/or an "employee" under all applicable statutes.

15. Defendant NextEra Energy, Inc. is a Florida corporation with its principal place of business located at 700 Universe Boulevard, Juno Beach, Florida 33408.

16. Defendant Florida Power & Light Company is a Florida corporation with its principal place of business located at 700 Universe Boulevard, Juno Beach, Florida 33408.

17. Florida Power & Light Company is a wholly owned subsidiary of NextEra, and the two companies share numerous functions, including human resources, accounting, IT and finance. At all relevant times, Ms. Morris was jointly employed by both companies.

**FACTUAL ALLEGATIONS**

**I.    Ms. Morris's Outstanding Performance**

18. In November 2015, Ms. Morris was hired as an Internal Auditor in FPL's Internal Audit Department.

19. Ms. Morris excelled as an Internal Auditor, receiving only above-average performance reviews, and twice securing performance ratings of four out of five.

20. In addition, Ms. Morris received a promotion to Intermediate Internal Auditor ahead of schedule.

21. In December 2017, Ms. Morris was again promoted, this time to Senior Accountant in the Sarbanes-Oxley (SOX) Compliance Department. Ms. Morris was assured by Melissa Thomas, her new manager, that this new role would provide her with the flexibility to work from home as needed. In fact, the SOX Compliance Department had one other employee and five other contractors who exclusively worked remotely.

**II.   Ms. Morris's New Role in the SOX Compliance Department**

22. Despite certain obstacles, Ms. Morris excelled in her new position within the SOX Compliance Department.

23. For example, in January 2018, two months into her new role, Ms. Morris was suddenly saddled with significant additional duties and responsibilities at the busiest time of the year for her role after her colleague, Roni King, moved to a different department.

24. Further, in March 2018, Ms. Thomas, Ms. Morris's manager, began maternity leave, leaving Ms. Morris without managerial support for several months.

25. Ultimately, in June 2018, FPL hired a replacement for Ms. King named Joe Rodriguez, whom Ms. Morris was responsible for training.

26. Ms. Morris had certain concerns about Mr. Rodriguez's willingness to work as a team, which she promptly raised with Ms. Thomas. However, Ms. Thomas declined to take any meaningful action, including refusing to implement any of Ms. Morris's suggested solutions, and acknowledged that she (Ms. Thomas) did not know how to handle this situation.

27. In July 2018, Ms. Thomas informed Ms. Morris that a client, Deloitte, had mentioned that Ms. Morris had not complied with an unspecified request made by a Deloitte team member, and that Ms. Morris had made a certain unspecified comment during a meeting.

28. Ms. Morris had not been aware of these issues, and asked Ms. Thomas to identify the alleged request and comment in order to rectify any misunderstanding or error. However, Ms. Thomas declined to provide any additional information, insisting that the specific details did not matter, and that the issues did not need to be pursued any further.

29. Notably, Ms. Thomas told Ms. Morris during her July mid-year review that Ms. Morris's work product continued to be outstanding notwithstanding the above issues, which, according to Ms. Thomas, were easily resolvable.

30. Moreover, over the next six months, which led up to Ms. Morris's firing, Ms. Morris and Ms. Thomas met roughly once a week to discuss any issues or concerns, and at no

point did Ms. Thomas give Ms. Morris anything but positive feedback, while also frequently praising Ms. Morris's performance.

### III. Ms. Morris Requests a Reasonable Medical Accommodation to Address a Mental Health Disability

31. In the morning of December 19, 2018, Ms. Morris submitted a formal written request for a temporary medical accommodation to work remotely for six months in order to address her mental health disability. The following day, December 20, 2018, Ms. Morris resubmitted the written accommodation request, along with documentation from a licensed mental health professional.

32. In the afternoon of December 19, 2018, Ms. Morris and Ms. Thomas held their standard weekly check-in meeting.

33. During this meeting, for the first time, Ms. Thomas questioned Ms. Morris about working remotely back on December 13, 2018 without having notified Ms. Thomas. Ms. Morris explained that she had done so for health reasons, and did not contact Ms. Thomas because Ms. Thomas had been away from work.

34. Ms. Thomas did not take issue with Ms. Morris's explanation, nor did Ms. Thomas accuse Ms. Morris of not working that day (and in fact, Ms. Morris remotely completed all the work she otherwise would have done from the office that day).

35. Further, Ms. Thomas again brought up the informal feedback from Deloitte, which had not been brought up again since having first been mentioned months earlier.

36. In response, Ms. Morris reminded Ms. Thomas that she had specifically asked for details in order to try to rectify Deloitte's concerns and learn from any possible mistakes, but that Ms. Thomas had refused to provide any, and unequivocally told her to put the issues behind her.

37. Ms. Thomas also indicated that she was considering giving Ms. Morris a "below average" year-end performance rating when formal reviews would be issued in late-January. This was quite surprising to Ms. Morris because she had received exclusively positive feedback from Ms. Thomas about her performance over the prior six months, particularly during their weekly check-in meetings.

38. Ms. Morris respectfully disagreed with Ms. Thomas's purported reasoning for the "below average" performance rating, and provided rebuttals based on objective facts.

39. Nevertheless, nothing during this meeting indicated that Ms. Morris's job was at all at risk, or even that she would be disciplined in some way for her performance, such as being given a warning or placed on a performance improvement plan.

40. Notably, in regards to Ms. Morris's accommodation request, Ms. Thomas took issue with Ms. Morris having contacted HR and not her about the request, which she said made her "look bad."

IV. **Ms. Morris's Unlawful Firing**

41. Following her December 19, 2018 meeting with Ms. Thomas, Ms. Morris was permitted to and successfully completed all her work remotely while FPL purportedly reviewed her temporary medical accommodation request.

42. On January 7, 2019, Ms. Morris spoke with Andrea Ramsel, an HR employee, and was told that FPL would respond to her medical accommodation request by January 15, 2019.

43. However, FPL did not contact Ms. Morris about her accommodation request on or by January 15, 2019.

44. Instead, the next day, during their weekly check-in call, Ms. Thomas, who was joined on the call by Ms. Ramsel, notified Ms. Morris that her employment was being terminated.

45. The purported reasons given for the termination decision were: (a) alleged communication issues; and (b) because Ms. Morris had worked remotely without approval on December 13, 2018.

46. Notwithstanding the incredibly suspicious timing of this termination decision, *i.e.*, less than one month after Ms. Morris requested a reasonable accommodation to address her mental health disability, and the very day after which she was promised she would receive a response to her accommodation request, the reasons given for Ms. Morris's firing are clearly pretextual and meant to mask discriminatory and retaliatory animus.

47. For one, when Ms. Morris previously requested specific information regarding communication issues concerning Deloitte in order to understand and rectify the alleged issues, Ms. Thomas refused to provide this information, and went so far as to specifically assure Ms. Morris that the matter did not need to be pursued any further.

48. Moreover, regarding the fact that she worked remotely on December 13, 2018, Ms. Morris had previously explained to Ms. Thomas that this was due to legitimate mental health reasons, and in any event, Ms. Morris was able to effectively complete all her work that day. Furthermore, this issue was raised only after she formally submitted her accommodation request. In short, this was hardly an incident that justified abruptly terminating Ms. Morris's employment.

49. Instead, FPL simply decided that they were better off terminating Ms. Morris because of her disability rather than granting or otherwise engaging in the interactive process to address her request for a reasonable accommodation under federal and state law.

### V. FPL Further Retaliates Against Ms. Morris After She Retains Counsel and Engages in Protected Activity

50. At the same time FPL notified Ms. Morris that her employment was being terminated, FPL immediately blocked Ms. Morris's access to her work computer hard drive.

51. Ms. Morris had saved certain personal files on her work computer's hard drive, including photos from her wedding and other files which hold significant sentimental value. In fact, Ms. Morris possesses no other copies of these files besides the ones she had saved to her work hard drive.

52. Following her sudden termination, Ms. Morris requested that FPL provide her with a copy of the personal files saved on her work hard drive.

53. On February 19, 2019, Ms. Morris spoke with Ms. Ramsel and a member of Defendants' IT team and identified the personal files on her work hard drive. Ms. Ramsel assured Ms. Morris that her personal files would be returned to her.

54. Later that day, Ms. Morris, through her counsel, sent FPL a letter outlining her claims of disability discrimination and retaliation as a result of her reasonable medical accommodation request. The letter also notified FPL that Ms. Morris intended to initiate litigation in connection with her claims, and requested that relevant documents and communications be preserved in connection with any potential litigation.

55. However, in an act of retaliation in response to Ms. Morris's decision to seek legal counsel in regards to her claims of unlawful disability discrimination and retaliation FPL's in-house counsel suddenly refused to turn over Ms. Morris's personal files saved on her work hard drive to her, despite knowing the tremendous sentimental value and importance these files held.

56. FPL's purported justification for now refusing to give Ms. Morris back her personal files after she engaged in protected activity – that they cannot provide these files in light of the document preservation request in Ms. Morris's February 19, 2019 correspondence – is utterly baseless since copying these files and turning them over to Ms. Morris would in no way compromise the files' preservation.

57. Rather, this is yet another blatant act of retaliation perpetrated by FPL to further punish Ms. Morris for having a mental health disability and requesting a reasonable accommodation simply to improve her wellbeing.

## FIRST CAUSE OF ACTION
### (Discrimination in Violation of the ADA)
*Against All Defendants*

58. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

59. Plaintiff suffered from a disability, was perceived as suffering from a disability and/or had a record of a disability as defined by the ADA.

60. By the actions described above, among others, Defendants discriminated against Plaintiff in violation of the ADA by denying her equal terms and conditions of employment on account of her disability, including, but not limited to, refusing to accommodate her disability and terminating her employment.

61. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the ADA, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of monetary damages and other relief.

62. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the ADA, Plaintiff has suffered, and continues to suffer, severe mental anguish

and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

63. Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the ADA for which Plaintiff is entitled to an award of punitive damages.

**SECOND CAUSE OF ACTION**
**(Retaliation in Violation of the ADA)**
*Against All Defendants*

64. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

65. Plaintiff suffered from a disability, was perceived as suffering from a disability and/or had a record of a disability as defined by the ADA.

66. By the actions described above, among others, Defendants retaliated against Plaintiff in violation of the ADA by, *inter alia*, terminating her employment after she invoked her rights under the ADA by requesting a reasonable disability accommodation, and by refusing to provide her with her personal files saved on her work computer after she complained about being discriminated against because of a disability and request for a reasonable disability accommodation.

67. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the ADA, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of monetary damages and other relief.

68. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the ADA, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and

anxiety, loss of self-esteem and self-confidence and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

69. Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of the ADA for which Plaintiff is entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
**(Disability Discrimination in Violation of the FCRA)**
*Against All Defendants*

70. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

71. Plaintiff suffered from a disability, was perceived as suffering from a disability and/or had a record of a disability as defined by the FCRA.

72. By the actions described above, among others, Defendants discriminated against Plaintiff in violation of the FCRA by denying her equal terms and conditions of employment on account of her disability, including, but not limited to, refusing to accommodate her disability and terminating her employment.

73. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the FCRA, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of monetary damages and other relief.

74. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the FCRA, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

75. Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the FCRA for which Plaintiff is entitled to an award of punitive damages.

## FOURTH CAUSE OF ACTION
### (Retaliation in Violation of the FCRA)
*Against All Defendants*

76. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

77. Plaintiff suffered from a disability, was perceived as suffering from a disability and/or had a record of a disability as defined by the FCRA.

78. By the actions described above, among others, Defendants retaliated against Plaintiff in violation of the FCRA by, *inter alia*, terminating her employment after she invoked her rights under the FCRA by requesting a reasonable disability accommodation, and by refusing to provide her with her personal files saved on her work computer after she complained about being discriminated against because of a disability and request for a reasonable disability accommodation.

79. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the FCRA, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of monetary damages and other relief.

80. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the FCRA, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

81. Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of the FCRA for which Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A. A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the State of Florida;

B. An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic harm; for harm to her professional and personal reputation and loss of career fulfillment; for all non-monetary and/or compensatory harm, including, but not limited to, compensation for mental anguish; and all other monetary and/or non-monetary losses suffered by Plaintiff;

D. An award of punitive damages, to the greatest extent permitted by law;

E. An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees and expenses to the fullest extent permitted by law; and

F. Such other and further relief as Plaintiff is entitled to under applicable law, and/or which the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: January 28, 2020
      New York, New York    Respectfully submitted,

**WIGDOR LLP**

By: _____
    Bryan L. Arbeit
    Douglas H. Wigdor
    (*pro hac vice* admission pending)
    Tanvir H. Rahman
    (*pro hac vice* admission pending)

85 Fifth Avenue
New York, NY  10003
Telephone:  (212) 257-6800
Facsimile:   (212) 257-6845
barbeit@wigdorlaw.com
dwigdor@wigdorlaw.com
trahman@wigdorlaw.com

*Counsel for Plaintiff*